

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | 2:08-CR-0062 (01) |
| | § | |
| JOSEPH WILLIAM WOLFE | § | |

**REPORT AND RECOMMENDATION
TO DENY DEFENDANT'S MOTION TO SUPPRESS
EVIDENCE SEIZED DURING A VEHICULAR STOP[1]**

Came for consideration the motion to suppress filed January 15, 2009 by defendant JOSEPH WILLIAM WOLFE. On January 21, 2009, an evidentiary hearing was held. Upon consideration of the evidence presented at the hearing, the pleadings, and controlling case law, the undersigned United States Magistrate Judge is of the opinion defendant's motion to suppress should be DENIED.

I.
FACTUAL BACKGROUND[2]

On August 20, 2008, at approximately 9:58 a.m., Trooper Ben Dollar was traveling westbound on I-40 in Carson County, Texas in a marked vehicle. The Trooper observed a white passenger car traveling eastbound. His radar clocked the car at 77 miles per hour, a speed in excess of the posted speed limit of 70 miles per hour. The Trooper crossed the highway median and

---

[1] A separate Report and Recommendation shall issue regarding suppression of any statements made by the defendant.

[2] The factual background is merely a summarization of the evidence presented at the evidentiary hearing and is not intended to be a complete, verbatim recitation of the evidence. If the parties believe a more exhaustive version of the evidence is necessary for a determination of this motion, they shall order a transcript of the hearing and file such with the Court.

pursued the vehicle which, he discovered, had Nevada license plates. As reflected by the video of the stop, Trooper Dollar pulled his vehicle alongside the white car, then dropped back and activated his overhead lights. The Trooper explained it is his normal procedure to pull alongside vehicles before stopping them so he can determine the number of occupants in the vehicle, observe if the front seat passengers are wearing their safety belts, and if the vehicle has a current registration.

Trooper Dollar approached the vehicle on the passenger side and explained the reason for the stop to the driver. The trooper asked for a driver's license and proof of registration. The driver, defendant WOLFE, advised the car was a rental car and provided the trooper with his driver's license, but advised the trooper the rental car agreement was in the trunk. Trooper Dollar testified that while he was speaking with defendant WOLFE he observed, on the front passenger floorboard, an empty container for a "torch," and a butane canister. Trooper Dollar testified that through his training and experience, the type of small "torch" he observed is often used to smoke methamphetamine.[3] While he was initially speaking with defendant, Trooper Dollar testified he observed a man laying flat in the back seat covered with a blanket. The trooper testified he found it unusual that the man did not rise up from his prone position while the trooper was speaking with the driver but, instead, appeared to feign sleeping despite the traffic stop and the conversation the trooper was having with defendant WOLFE.

Defendant WOLFE exited the car and opened the trunk to retrieve a bag. Trooper Dollar testified that when defendant opened the trunk, he (the trooper) observed a glass beaker partially wrapped in a black shopping-style bag.[4] The trooper testified that through his training and

---

[3]This type of "torch" also has a legitimate use as a small soldering iron.

[4]The trooper acknowledged the inventories of the contents of the vehicle did not describe the container, or sack, in which he observed the glass beaker in the trunk.

experience, beakers such as the one he saw are often used in the manufacturing of methamphetamine. After retrieving the bag, defendant closed the trunk and set about retrieving the car rental documents from this bag. While he was searching for the documents, the trooper questioned defendant WOLFE about his trip. After handing the necessary documents to the trooper, defendant WOLFE placed the bag in the backseat of the rental car and, upon the trooper's request, seated himself in the trooper's patrol car.

Trooper Dollar then returned to the open car window to identify the passenger. Trooper Dollar testified that while he was speaking with the passenger, he observed, on the floor of the back seat, the actual "torch." The passenger sat up at the trooper's request and, while he was searching for his identification in various places, responded to questioning by the trooper concerning his trip. The passenger advised his identification must be in the trunk, exited the car and opened the trunk to obtain it. Trooper Dollar testified that when the passenger opened the trunk, he again observed the beaker partially wrapped by the black plastic shopping sack. While the passenger was searching for his identification in a bag in the trunk with the trunk open, Trooper Dollar continued to question him concerning their trip. At that point, Trooper Dollar testified defendant WOLFE yelled from the patrol car something to the effect of, "Are you sure you didn't put your wallet up front?" After the passenger retrieved his identification and handed it to the trooper, the trooper continued to question the passenger about the details of the trip. The trooper testified that when he asked the passenger about the torch in the back seat, he gave the trooper a blank look and after pausing stated, "It's not mine." The trooper asked the passenger to get back in the stopped vehicle and went to the patrol car. At that time, defendant WOLFE instructed the passenger to close the lid of the trunk so "things would not blow out."

Dollar Trooper entered the patrol car and proceeded to input information regarding the stopped individuals and the rental vehicle into the patrol car computer. While the trooper was waiting on the computer responses, he continued to talk with defendant WOLFE concerning his background and the nature of his trip. Trooper Dollar found several of defendant WOLFE's answers to be unusual or inconsistent with the passenger's answers and advised defendant WOLFE of such. The trooper clarified with defendant WOLFE that he (defendant) and the passenger had flown from Boston, Massachusetts to Phoenix, Arizona on Monday but left Phoenix on Tuesday and had driven through the night without stopping. Further, the rental agreement reflected the vehicle was a one-way rental from Phoenix, identified by Trooper Dollar as a drug source city, to Boston. The trooper, through his training and experience was aware that it is a common practice of drug couriers to fly to a source city and drive back to their home cities. Trooper Dollar also asked defendant WOLFE about the torch he observed in the rear seat floorboard to which the defendant replied that the passenger "burns things and stuff like that." When the trooper asked what type of things, defendant replied, "I don't know." The trooper explained he was asking about the torch because it was consistent with using narcotics. Trooper Dollar testified defendant WOLFE exhibited unusual nervousness during the stop which did not diminish as the stop proceeded. The trooper said, normally, an individual stopped for a traffic violation is nervous at the outset, but that such nervousness subsides as the stop progresses. The trooper opined that the level of nervousness typically continues only when additional criminal activity is taking place. Trooper Dollar testified that as he was waiting for the data on the patrol car computer, he had not made a decision whether he was going to arrest defendant and the passenger.

When the computer checks returned and the warning ticket printed, Trooper Dollar

explained the warning, advised defendant WOLFE to use the cruise control to better manage his speed, and handed over all of the paperwork to defendant WOLFE. Immediately upon handing over the paperwork and defendant's license, Trooper Dollar asked defendant WOLFE if they were carrying anything illegal. Defendant replied, "No sir." The trooper then confirmed that he had given all of defendant's property back to him and advised defendant he was going to return the passenger's identification. In response to statements by defendant, the trooper asked a brief series of questions as to whether defendant was driving back to Boston because they were carrying something they could not take back on a plane and identified examples. Defendant replied in the negative to each question. Trooper Dollar then asked if he could search the vehicle. Defendant WOLFE responded, "Yes sir, if you want to you sure can." The trooper advised it was a simple yes or no question, to which defendant stated, "Yes sir." Trooper Dollar asked defendant WOLFE to stand to the side of the patrol car and patted him down for safety.

The trooper then approached the stopped vehicle, returned the license to the passenger and asked if they were carrying anything illegal with specific examples to which the passenger replied in the negative. The trooper asked the passenger which bags were his and advised the passenger the driver had consented to a search of the vehicle. When asked if that was okay with him, the passenger replied that it was. Trooper Dollar then instructed the passenger to stand to the side of the patrol car and patted him down for safety.

Trooper Dollar leaned inside the passenger side door to begin his search. The trooper testified that upon leaning into the car, he immediately viewed a glass pipe lodged between the center console and the passenger's seat. Within seconds of the trooper entering the car, however, the following exchange transpired between defendant WOLFE, who was standing to the side of the

vehicles, and the trooper:

> Defendant: Officer? Officer?
>
> Trooper: What?
>
> Defendant: Can I talk to you?
>
> Trooper: [Motioning to come closer]. Right there is good. [Pointing to a location off camera and to the side of the vehicles].
>
> Defendant: I don't know what he might have brought back with him.
>
> Trooper: Okay. [Walking off camera to the side of the vehicles].
>
> Defendant: And for that reason I would rather not give permission to search so . . . [indiscernible].
>
> Trooper: Okay, well what we'll do now is I'm going to call a canine. What will happen with that is we'll do a free air search.
>
> Defendant: [Indiscernible] Please sir.
>
> Trooper: No, no. [Closing passenger side door of vehicle]. Listen to me. You just said no. [Indiscernible].
>
> Defendant: [Indiscernible].
>
> Trooper: [Indiscernible]. Now, you didn't take me telling you that I was going to use a canine as persuasion, did you?
>
> Defendant: [Indiscernible].
>
> Trooper: You're giving me permission to search this entire vehicle? You just wanted to know what I was doing?
>
> Defendant: Yes sir.

At the hearing, the trooper testified his comment that he would call for a canine search was not intended to persuade defendant to reinstate his consent to search. The trooper explained that after defendant had approached him from behind during the search he considered such approach

dangerous and his comments to the defendant were intended to diffuse the situation, which he believed was becoming confrontational and threatening. Trooper Dollar also stated he wanted to make sure the defendant's reinstatement of the consent to search was voluntary.

The trooper then continued his search of the vehicle during which he found numerous glass pipes in addition to the beaker and pipe previously discovered, found methamphetamine concealed in the bag defendant had retrieved from the trunk and placed in the back seat, and an additional beaker. Defendant WOLFE and the passenger were arrested and Trooper Dollar advised them both of their *Miranda* rights. The video reflects that after the arrest, while sitting in the front of the patrol car, defendant, in a dazed state,[5] denied any understanding of what was transpiring and described the sequence of events by stating he was driving, was stopped for speeding and then the trooper "threatened to put dogs on [him] if [he] didn't let [the trooper] in the car." The trooper challenged defendant's version of the events, stated his version, and advised defendant that everything was captured on video and audio.

## II.
## INITIAL STOP

Defendant was traveling 77 miles per hour in a 70 mile per hour zone. Exceeding the speed limit is a violation of the traffic laws of Texas. The trooper witnessed a violation of Texas law and had probable cause to stop the vehicle. The initial stop was justified.

---

[5] It is impossible to tell from the video, which reflects defendant's post-arrest actions from a camera in the front of the patrol car, whether defendant was truly in a disoriented or disassociative state, or was feigning a lack of awareness and understanding of the events that were transpiring. The validity of defendant's actions were not reinforced by the trooper's inquiry as to whether he needed medical assistance, especially when subsequent video reflects a significant change in defendant's demeanor.

# III
# PROLONGED DETENTION

Approximately 13 minutes plus elapsed from the initial stop of the vehicle until the trooper issued defendant WOLFE his warning citation and returned his documents to him. While the purpose of the traffic stop was complete as to defendant WOLFE when Trooper Dollar issued the warning citation, explained the citation to defendant, and returned defendant's documents to him, the trooper still possessed the passenger's identification and needed to return such to him. Upon concluding the traffic stop as to defendant WOLFE, the trooper asked the series of questions concerning whether defendant was transporting anything illegal. This series of questions lasted a few seconds. Upon the conclusion of these questions, the trooper asked for consent to search the vehicle. To the extent defendant argues the few seconds during which the trooper asked him this series of questions before he (the defendant) gave consent to a search of the vehicle was a prolonged detention which rendered any subsequent consent invalid, such argument is without merit. In *United States v. Brigham*, 382 F.3d 500 (5th Cir. 2004) (*en banc*), the Fifth Circuit expressly held "[t]here is . . . no constitutional stopwatch on traffic stops. Instead, the relevant question in assessing whether a detention extends beyond a reasonable duration is whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Id*. at 511. Trooper Dollar asked defendant for consent to search the vehicle almost immediately after returning his driver's license and other documents, and before the passenger's identification documents were returned to him. The undersigned does not find an unconstitutionally prolonged detention occurred in this case prior to the defendant giving consent to search.

# IV.
# CONSENT

Defendant WOLFE consented to a search of his vehicle. To determine whether the consent was valid, this Court must ask whether consent was voluntary. To determine whether consent was voluntary, this Court must consider (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Jones*, 234 F.3d 234, 242 (5th Cir. 2000). The government bears the burden of proving consent was voluntary. *See id.*

   1.   Custodial status

Defendant had not been arrested or handcuffed. Defendant had signed the warning citation, had been told by the trooper to set his cruise control, had received a copy of the warning ticket, and had, in his possession, the returned identification and rental car agreement. The only remaining act was to return the identification documents to the passenger. At the time defendant gave consent to search the vehicle, his custodial status was minimal and was no more onerous than necessary to complete the traffic stop.

   2.   Coercive police procedures.

There were no coercive police procedures utilized over and above the temporary detention resulting from a normal traffic stop.

3. <u>Defendant's cooperation</u>.

Defendant freely provided information to Trooper Dollar during the encounter. Although the trooper testified he believed defendant attempted to distract the trooper by certain actions and employed subtle tactics of instructing his passenger's actions, any such attempts do not indicate any consent was not voluntary.

4. <u>Awareness of right to refuse consent</u>.

There was no testimony concerning whether defendant did or did not know, at the time he initially gave consent, that he could refuse consent, limit consent, or withdraw consent. There was no testimony that defendant advised anyone at or about the time of his arrest of his allegation that his consent to search the vehicle was solely a result of his belief that he could not refuse a search. Trooper Dollar did not utilize a consent form advising defendant of his right to refuse, nor did the trooper verbally advise defendant of his right to refuse consent. The defendant, however, did subsequently withdraw his consent to search indicating his awareness that consent could be withdrawn.

5. <u>The defendant's education and intelligence</u>.

Based on subsequent statements made by defendant after his arrest, it appears the defendant has an advanced educational level. It appears the defendant served in the military and was an anesthetist. There is nothing from the testimony before the Court which indicates defendant's educational or intelligence level was diminished or impaired in any manner.[5]

---

[5] Again, as reflected by the video, defendant's demeanor changed substantially from the initial moments after his arrest, to the ride to the impoundment barn and after the impoundment of the rental car when riding to the jail.

6. <u>The defendant's belief no incriminating evidence will be found</u>.

A glass pipe was found between the front seat and center console, an area easily visible. However, the drugs were found inside luggage in the back seat of the vehicle. There is no evidence defendant thought the trooper would look inside the luggage. Even if the defendant was aware that the trooper might find drugs, he still may have thought the search would be cursory and not uncover the methamphetamine.

The undersigned finds the factors listed above support a finding that defendant's consent was voluntary. The trooper requested consent at the time of the completion of the stop, *i.e.*, when the warning was issued. Defendant had at all times been cooperative and seemed to understand and be able to communicate with the trooper.

As noted above, the consent in this case was provided contemporaneously with the completion of the traffic stop, therefore, the consent was not given during any illegal detention. As the consent was not given during an illegal detention, the Court is not required to make any further determination as to whether the consent was an independent act of free will so as to determine if there is a break in the causal chain between a constitutional violation and the consent. *See United States v. Jenson*, 462 F.3d 399, 407 (5th Cir. 2006).

## V.
## VOLUNTARINESS OF REINSTATEMENT OF CONSENT

The video of the stop reflects defendant WOLFE revoked or attempted to revoke his consent to search shortly after Trooper Dollar began his search of the front seat area. The video also reflects the trooper immediately stopped searching upon the revocation of consent. The trooper informed defendant it was "okay" to revoke the consent, but that he was going to call a dog to the scene to

conduct a free air search. Trooper Dollar did not exhibit animosity, impatience or aggression when he made this statement, nor did he make this statement in a threatening manner. Defendant WOLFE then again consented to the search. The trooper advised defendant he did not want to persuade defendant WOLFE to give consent to a search but, instead, was just advising him that a canine would, in fact, be summoned. Defendant assured the trooper that he did not take the trooper's statement that he would summon a dog as an attempt to persuade his consent. The undersigned cannot find, under the totality of the circumstances, that defendant's reinstatement of consent was not voluntarily given. Although defendant's reinstatement of consent may have been initially influenced by the trooper's statement, it was not a product of coercion by the trooper or given as a result of threats by the trooper. Instead, in all likelihood, it was an attempt or hope by the defendant that the trooper conducting the search might fail to find the concealed controlled substances, a less certain prospect than if a drug detecting dog were called to the scene. The undersigned finds defendant's reinstatement of consent voluntary.

## VI.
## DETENTION FOR THE ARRIVAL OF A DRUG DETECTION CANINE

Even if the reinstatement of consent was not valid, the trooper had grounds upon which to further detain the defendant until a canine arrived. When defendant withdrew his consent to search, Trooper Dollar stated that such withdrawal was "okay" and advised defendant he was going to call for a canine for an open air search. The trooper's statement was not a misrepresentation. At that time, there were four (4) canines within the general vicinity that could be used for canine searches, three (3) of which were in close proximity to the scene. The trooper testified that considering the totality of the circumstances, he believed he had reasonable suspicion, if not probable cause, to

detain defendant until the arrival of a canine unit.

Calling for a canine unit[6] and awaiting its arrival would require that defendant be further detained. The undersigned finds Trooper Dollar had sufficient reasonable suspicion that defendant WOLFE was in possession of controlled substances to justify a further detention for a canine search based on:

1. The plain view of the narcotics paraphernalia – the torch lighter box, butane canisters, and pipe located in the front passenger area, the torch lighter located in the back passenger floorboard, and the glass beaker type pipe located in the trunk area.

2. The inconsistencies in the statements of defendant WOLFE and the passenger regarding the trip – the passenger said they had been in Phoenix three days, defendant WOLFE said one day. The passenger said they had visited defendant WOLFE"s friends, Anya and Carlos, defendant stated they had visited his Aunt Mabel, who was suffering from cancer, and his cousin Joey.

3. Defendant and his passenger had flown one way to Phoenix, then rented a vehicle to return to Boston, indicating to the trooper that they might be in possession of narcotics that could not be transported by commercial air. Phoenix is a hub city for drug distribution.

4. The food wrappers and energy drink containers in the vehicle were indicative of someone who was on a mission and did not want to stop unnecessarily during the trip and the fact that defendant confirmed they had driven through the night after leaving Phoenix.

5. Defendant WOLFE exhibited signs of nervousness that did not subside as the encounter progressed.

6. Defendant WOLFE told the trooper that the torch lighter belonged to the passenger because the passenger "likes to burn things." The passenger stated the torch lighter belonged to defendant.

---

[6] A canine search is not a search under the Fourth Amendment. *See United States v. Ibarra*, 493 F.3d 526, 531 (5th Cir.2007).

## VII.
## PROBABLE CAUSE

Under the automobile exception to the warrant requirement, a "lesser expectation of privacy" attaches to a vehicle "[w]hen [it] is being used on the highways." *California v. Carney,* 471 U.S. 386, 392, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). Therefore, officers may conduct a warrantless search of a vehicle "if they have probable cause to believe that the vehicle contains contraband or evidence of a crime." *Mack v. City of Abilene,* 461 F.3d 547, 552 (5th Cir.2006). "Probable cause exists when the totality of facts and circumstances within [an officer's] knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v. Nunez-Sanchez,* 478 F.3d 663, 666 (5th Cir.2007) (internal quotation omitted). The officer's knowledge need only "establish that there was a fair probability that a crime occurred." *Id.* at 666-67 (internal quotation omitted).

Here, as noted above under Section V., Trooper Dollar had viewed the torch lighter box and butane canister in the front passenger floorboard, the torch in the back floor board, and the glass beaker in the trunk and the "meth pipe" in the front seat area. These viewings, in and of themselves, were sufficient for a reasonable person to conclude defendant and his passenger were committing a drug offense even if it were merely misdemeanor possession of a drug or drug paraphernalia. *See, e.g.*, Texas Health & Safety Code § 481.125 (2008). The totality of the facts and circumstances, however, were also sufficient for a reasonable person to conclude defendant and his passenger were committing a greater drug offense. The items identified above which were in plain view, plus the inconsistent details of the trip given by defendant and his passenger, the modes of transportation to and from Boston to Phoenix, the length of the visit despite the great distance of

travel, the fact that Phoenix is a known hub for narcotics distribution, the one way rental of the car, the non-stop driving after leaving Phoenix, the continued nervousness of defendant, the unusual actions of the passenger in remaining lying in the backseat all provide, under the totality of the facts and circumstances of this case, probable cause to search the stopped vehicle. Consequently, the voluntariness of defendant WOLFE's reinstatement of consent after withdrawal, and whether reasonable suspicion existed to prolong the detention for a canine unit, are actually non-issues because there was sufficient probable cause developed prior to the defendant's attempt to withdraw consent, to warrant a search of defendant's vehicle.

## VIII.
## RECOMMENDATION

It is the RECOMMENDATION of the United States Magistrate Judge to the United States District Judge that the motion to suppress filed by defendant JOSEPH WILLIAM WOLF be DENIED as to all evidence discovered in the search of his vehicle.

## IX.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to forward a copy of this Report and Recommendation to defense counsel and to the Assistant United States Attorney by the most expedient means available.

IT IS SO RECOMMENDED.

ENTERED this 30th day of January 2009.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

## * <u>NOTICE OF RIGHT TO OBJECT</u> *

Any party may object to this Report and Recommendation. *See* 28 U.S.C. § 636. This case is set for docket call on Monday, February 9, 2009, and trial on Tuesday, February 10, 2009. Therefore, all objections must be filed by **4:30 p.m. on Thursday, February 5, 2009.** Any such objections shall be in writing and shall specifically identify the portions of the findings, conclusions, or recommendation to which objection is made, and set out fully the basis for each objection. Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on the Magistrate Judge and all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions set forth in this report and accepted by the district court. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).